1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

11  DALE M. SPURLIN and                    Case No.:  3:19-cv-02049-AJB-AHG
    MARY SPURLIN,
12                                         **ORDER:**
13                          Plaintiffs
                                           **(1) GRANTING IN PART AND**
14  v.                                     **DENYING IN PART DEFENDANTS'**
                                           **OMNIBUS MOTION FOR SUMMARY**
15  AIR & LIQUID SYSTEMS                    **JUDGMENT (Doc. No. 105) and**
    CORPORATION, et al.,
16                                         **(2) GRANTING IN PART AND**
17                          Defendants     **DENYING IN PART PLAINTIFFS'**
                                           **CROSS-MOTION FOR SUMMARY**
18                                         **JUDGMENT (Doc. No. 111)**
19
20
21

22        This maritime tort case concerns Dale M. Spurlin's alleged exposure to

23  asbestos-containing equipment during his service in the United States Navy from 1963 to

24  1969. Mr. Spurlin contends that his exposure to asbestos while aboard two Navy ships

25  caused him to develop mesothelioma. Mr. Spurlin and his wife Mary Spurlin (collectively,

26  "Plaintiffs") sued the equipment manufacturers, claiming that they are liable for damages

27  under the theories of negligence, strict liability, breach of express and implied warranties,

28  and loss of consortium.

                              1

Presently before the Court is an omnibus motion for summary judgment filed by the equipment manufacturers: Clark-Reliance Corporation ("Clark-Reliance"), Crane Co. ("Crane"), Foster Wheeler Energy Corporation and Foster Wheeler LLC (collectively "Foster Wheeler"), IMO Industries, Inc. ("IMO"), Tate Andale LLC ("Tate"), and Warren Pumps, LLC ("Warren") (collectively, "Defendants").[1] (Doc. No. 105.) Plaintiffs filed an opposition to Defendants' omnibus motion, and cross-moved for summary judgment on certain affirmative defenses. (Doc. No. 111).

For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' omnibus motion—specifically finding triable issues with respect to a duty to warn and causation as to all moving defendants except for Tate. Additionally, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' cross-motion—specifically finding triable issues with respect to the government contractor defense and superseding cause defense.

## I.   BACKGROUND

Mr. Spurlin served in the U.S. Navy from 1963 to 1969 and was aboard two naval ships, the *USS McGinty* and the *USS Rowan*. While on reserve duty, he spent one weekend a month on the *McGinty*, plus an 18-day cruise. Then, while on active duty from December 1964 through October 1966, Mr. Spurlin spent approximately two years straight on the *Rowan*. Mr. Spurlin was a boiler tender. He operated and maintained the boilers and related equipment in the fire rooms. In May 2019, Mr. Spurlin was diagnosed with malignant mesothelioma. Plaintiffs bring this action against Defendants, asserting that Mr. Spurlin's mesothelioma was caused by exposure to asbestos from materials, including asbestos-containing insulation, gaskets, and packing associated with handling Defendants' products during his service in the Navy.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.

---

[1] Defendant Air & Liquid Systems Corporation did not move for summary judgment.

Summary judgment permits a court to enter judgment on factually unsupported claims, *see Celotex Corp. v. Catrett*, 477 U.S. 319, 327 (1986), and may also be used on affirmative defenses. *Dam v. Gen'l. Elec. Co.*, 265 F.2d 612, 614 (9th Cir. 1958). Granting summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex,* 477 U.S. at 322, 324. The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir. 2003). However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Id.; Surrell v. Cal. Water Serv. Co.,* 518 F.3d 1097, 1103 (9th Cir.2008). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson*, 477 U.S. at 252. A party opposing summary judgment must come forward with "significant probative evidence tending to support its claim that material, triable issues of fact remain." *Sanchez v. Vild*, 891 F.2d 240, 242 (1989).

There is no dispute that "federal maritime law—'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules'—governs this case." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (citations omitted). "With admiralty jurisdiction comes the application of substantive admiralty law." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986). Such application, however, "does not result in automatic displacement of state law." *Jerome B.*

*Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995). "[F]ederal admiralty courts sometimes do apply state law." *Id.* at 546. In particular, state law may be used to supplement federal maritime law so long as it "compatible with substantive maritime policies." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 207 (1996). Generally, state law is not applied where it would be "inconsonant with the substance of federal maritime law." *Id.* at 207.

## III.  DISCUSSION

To begin, the Court first considers Defendants' omnibus motion for summary judgment and will thereafter proceed to Plaintiffs' cross-motion for summary judgment on certain affirmative defenses.

### A.     Defendants' Omnibus Motion for Summary Judgment

Defendants move for summary judgment on the grounds that: (1) they had no duty to warn of product hazards, (2) there is no proof of causation, (3) the government contractor defense immunizes them from liability, and (4) punitive damages and loss of consortium are unavailable. The Court discusses each argument in turn.

#### i.    Duty to Warn

Defendants argue that Plaintiffs' claims fail as a matter of law because there is no evidence that Defendants owed Mr. Spurlin a duty to warn of the dangers of asbestos associated with their products. Plaintiffs maintain that they have presented evidence to establish that Defendants owed a duty to warn under Supreme Court case law.

In *Air & Liquid Sys. Corp. v. DeVries,* 139 S. Ct. 986 (2019), the Supreme Court considered the scope of an equipment manufacturer's duty to warn of the dangers of asbestos and outlined the following rule of decision.

> In the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

*Id.* at 995. The Court considers each prong of the *DeVries* test in turn.

4

### 1. Required Incorporation of a Part

*DeVries* "requires that manufacturers warn only when their product *requires* a part in order for the integrated product to function as intended." 139 S. Ct at 995 (emphasis in the original). While the Supreme Court did not expressly define what "its product requires incorporation of a part" means, it provided examples of situations that would meet the standard, "including when (i) a manufacturer directs that the part be incorporated, (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part." *Id.* at 995–96.

Here, Defendants primarily claim that their products did not require incorporation of asbestos because it was not them who required incorporation of asbestos parts—it was the Navy. The Court finds this assertion unavailing. Like this case, *DeVries* concerned allegations that equipment manufacturers failed to warn of the dangers of exposure to asbestos-containing parts which the Navy required for use with its products. *Id.* at 991. It involved defendants who sold much of the equipment to the Navy "in a condition known as 'bare-metal,'" to which the Navy later added asbestos. *Id.* And in other times, "the equipment manufacturers themselves added the asbestos to the equipment," and the Navy later replaced the asbestos parts with third-party asbestos parts. *Id.* at 991 n.1. Despite its recognition that the Navy required incorporation of asbestos to the products, however, the Supreme Court made no indication that the Navy's directive would be fatal to the duty-to-warn inquiry. *Id.* at 991 ("The equipment required asbestos insulation or asbestos parts in order to function as intended."). As such, the Court does not find Defendants' argument that it was the Navy, not the manufacturers who required asbestos parts, to be dispositive here.

The Court will therefore proceed to analyze whether there is evidence that Defendants' products required incorporation of asbestos in this case. *See DeVries*, 139 S. Ct at 995.

5

### Clark-Reliance Corporation

The products at issue for Clark-Reliance are its Jerguson steam separator water gages with valves and 10-inch boiler water gages with valves, which were installed on each boiler on the *Rowan*. In support of their claim that Clark-Reliance's products required incorporation of asbestos, Plaintiffs point to retired Navy Captain Arnold Moore's expert report. (Doc. No. 109-21.) According to his report, Jerguson drawings reflect that each gage was sealed with four asbestos gaskets, and the stems were sealed with asbestos packing. (*Id.* at 15.)[2] The Court acknowledges that Clark-Reliance objects to the Jerguson drawings for lack of authentication. While formal authentication may be lacking, the drawings appear to be obtained from naval archives and are documents upon which experts in naval asbestos cases typically rely. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Further, the Court notes that it is Captain Moore's report that defeats the motion for summary judgment, not the Jerguson drawings.

In addition, Plaintiffs point to the deposition testimony of Clark-Reliance's expert in a prior naval asbestos case, wherein the expert testified that Jerguson's gage and accompanying gaskets needed to be replaced about three to four times per year, and that Jerguson sold replacement kits, which included asbestos gaskets.[3] (Doc. No. 111-6 at 3–4.) Captain Moore also testified that the valve packing would potentially need replacement every six months. (Doc. No. 109-6 at 21.) The evidence therefore indicates that Clark-Reliance was aware that its equipment entailed asbestos parts and would require

---

[2] The pinpoint page citations refer to the ECF-generated page numbers at the top of each filing.

[3] The Court recognizes that Clark-Reliance stated, in passing, that this deposition testimony is inadmissible. However, because there is no indication that the expert testimony was withdrawn by Clark-Reliance in the prior case, the Court finds it admissible as an adoptive admission pursuant to Federal Rule of Evidence 801(d)(2)(C). *See generally In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (finding that an expert's trial testimony provided in a prior trial is admissible because a party cannot "exclude trial testimony that she, herself, proffered") (citing with approval *Glendale Fed. Bank, FSB v. United States*, 39 Fed.Cl. 422, 424-25 (1997) (indicating that an expert's deposition testimony may be an adoptive admission if the expert was not withdrawn as a trial witness)).

replacement with asbestos parts.

Thus, based on the foregoing, the Court finds that the evidence shows that Clark-Reliance made its products with asbestos and knew that they would require replacement with a similar part. *See DeVries*, 139 S. Ct. at 995 (finding that a product requires incorporation of a part where "a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part"). Accordingly, the Court finds that the first *DeVries* prong, whether the product requires incorporation of a part, is satisfied with respect to Clark-Reliance.

### Crane Co.

As for Crane Co., various Crane valves were installed on the *McGinty* and the *Rowan*. According to Captain Moore's report, Crane drawings indicate that the valves contained asbestos packing and were manufactured with Cranite, an asbestos sheet gasket specially manufactured for Crane. (Doc. No. 109-21 at 12, 18.) The drawings for the valves on the *Rowan* also specify the use of asbestos packing to seal valve stems. (*Id.* at 18.) Moreover, a series of Crane documents detailing the Navy's orders and requests for parts reflect that Crane supplied the Navy with asbestos replacement packing and gaskets for overhauls or repairs to its equipment. (*Id.* at 19–20.) Additionally, Captain Moore reported that there was a Crane "Master Parts Book" carried on Navy ships, which stressed the importance of ordering the manufacturer's parts for replacements parts for its valves. (*Id.* at 22.) As such, the evidence shows that Crane was aware that its equipment entailed asbestos parts and would require replacement with asbestos parts.

Further, internal Crane documents evidence that as late as 1981, the company believed there to be few substitutes for asbestos and that none of them could withstand the range of temperature, corrosion, and impact the way asbestos did. (*Id.* at 7.) This indicates that Crane did not manufacture asbestos-free alternatives and continued to search for adequate substitutes for asbestos. (*Id.*) That Crane believed there to be no adequate substitute for asbestos parts during the relevant period also suggests that they directed that asbestos parts be integrated with their products and that their product would not function

as intended without the asbestos parts. *See DeVries*, 139 S. Ct. at 995–96 (finding that a product requires incorporation of a part where "a manufacturer directs that the part be incorporated" and where "a product would be useless without the part").

Thus, based on the foregoing, the Court finds that the evidence shows that Crane made its products with asbestos and knew that they would require replacement with a similar part. *Id*. at 995. Accordingly, the Court finds that the first *DeVries* prong, whether the product requires incorporation of a part, is satisfied with respect to Crane.[4]

### Foster Wheeler

Foster Wheeler supplied the Navy with boilers and replacement parts on the *Rowan*. According to Captain Moore's report, Foster Wheeler's Bills of Material and Productions specify that the boilers contained asbestos gaskets, asbestos tape, asbestos millboard, asbestos rope, and several valves with asbestos packing. (Doc. No. 109-21 at 13–14.) In addition, the boilers' furnaces contained asbestos insulating block. Moreover, a Foster Wheeler drawing shows that the company provided asbestos-containing insulating block, asbestos-containing cement, and asbestos millboard for use in the boilers' furnaces. (*Id.* at 30.) And deposition testimony establishes that in 1971, Foster Wheeler continued to specify asbestos-containing insulating block because it was the only available material for the product's designated use in high-temperature settings. (Doc. No. 111-7 at 4–5.) This evinces that the products would not function as intended without the asbestos parts. Further, Foster Wheeler sales documents show that the company sold asbestos-containing replacement parts for use on Navy ships. (Doc. No. 109-21 at 21–22.) In sum, the evidence indicates that Foster Wheeler was aware that its equipment entailed asbestos parts and

---

[4] Crane urges the Court to rely on *O'Neil v. Crane Co.*, 53 Cal. 4th 335 P.3d 987 (2012) to find that it has no duty to warn in this case. *O'Neil*, however, did not analyze federal maritime law. Rather, it analyzed California tort law, which appears to entail a stricter interpretation of what it means for a manufacturer's product to "require" a part. Consequently, because *O'Neil* appears to apply a narrower scope of duty than that announced in *DeVries*, the Court finds that *O'Neil*'s result is not binding here. *See Yamaha Motor*, 516 U.S. at 207; *accord NextWave Marine Sys., Inc. v. M/V Nelida*, No. 3:19-CV-01354-IM, 2020 WL 6693242, at *5 (D. Or. Nov. 12, 2020) ("[S]tate law may not be applied where it would conflict with maritime law.") (citing cases).

would require replacement with asbestos parts.

Thus, based on the foregoing, the Court finds that the evidence shows that Foster Wheeler made its products with asbestos and knew that they would require replacement with a similar part. *See DeVries*, 139 S. Ct. at 995. Accordingly, the Court finds that the first *DeVries* prong, whether the product requires incorporation of a part, is satisfied with respect to Foster Wheeler.

## IMO Industries, Inc.

As for IMO, the company supplied the Navy with DeLaval pumps, which were installed on the *McGinty* and the *Rowan*. DeLaval drawings indicate that these pumps had valves for which use of asbestos packing was specified. (Doc. No. 109-21 at 16.) The drawings further indicate that the turbines driving each of the pumps contained asbestos gaskets and were required by the Navy to be insulated and lagged with asbestos materials. (*Id.*) Additionally, deposition testimony shows that from the 1940s to the 1970s, DeLaval incorporated asbestos parts to its equipment prior to selling and shipping it to the Navy. (Doc. Nos. 111-8 at 16–17; 111-9 at 5, 11–12.) Deposition testimony also confirms that until 1986, DeLaval pumps utilized asbestos gaskets and packing in the equipment it sold to the Navy, that it was foreseeable to IMO that the asbestos parts would have to be replaced, and that DeLaval supplied spare asbestos gaskets to the Navy for its ships. (Doc. Nos. 111-10 at 12, 15–16; 111-11 at 4; 111-12 at 3.) As such, the evidence indicates that IMO was aware that its equipment entailed asbestos parts and would require replacement with asbestos parts.

Thus, based on the foregoing, the Court finds that the evidence shows that IMO made its products with asbestos and knew that they would require replacement with a similar part. *See DeVries*, 139 S. Ct. at 995. Accordingly, the Court finds that the first *DeVries* prong, whether the product requires incorporation of a part, is satisfied with respect to IMO.

## Tate Andale LLC

In an effort to establish Tate's duty to warn, Plaintiffs point only to a drawing by "Andale Co." which lists several asbestos gaskets for a ships service generating unit oil

cooler. (Doc. No. 111-13 at 2.) However, Plaintiffs' assertion that this Andale cooler was on the *Rowan* is not supported by evidence. The drawing contains no references to the *Rowan*, and indeed, instructs the reader to verify the applicability of the plan using the ships plan index. Plaintiffs provide no index with which to verify that the drawing is applicable to the *Rowan*. Notably, Plaintiffs' expert, Captain Moore, confirmed that he did not find any evidence of any Tate Andale equipment in the fire rooms in which Mr. Spurlin worked. (Doc. No. 109-6 at 46.) Plaintiffs' unsupported contention that an Andale cooler was aboard the *Rowan* therefore amounts to speculation. Furthermore, it is undisputed that Tate did not use the name "Andale" on any product it supplied prior to 1985, which is several years after Mr. Spurlin's service in the Navy.

Consequently, as there is no reliable evidence that a Tate product was on the vessels on which Mr. Spurlin served,[5] the Court finds that Plaintiffs have not presented competent evidence to prove that Tate owed a duty to warn in this case. Accordingly, the Court **GRANTS** Tate's motion for summary judgment on this basis.[6]

## Warren Pumps, LLC

As for Warren, the company supplied the Navy with pumps in the fire rooms on the *Rowan*. According to Captain Moore, Warren drawings specify the pumps' use with asbestos packing and asbestos gaskets, and asbestos insulation. (Doc. No. 109-21 at 16.) In addition, Warren insulated each pump with asbestos fiber at its manufacturing facility. (*Id.*) Captain Moore also reported that Warren provided asbestos-containing replacement parts for its pumps for use during overhaul of Navy ships. (*Id.* at 23.) Thus, based on the foregoing, the Court finds that the evidence shows that Warren made its products with asbestos and knew that they would require replacement with a similar part. *See DeVries*, 139 S. Ct. at 995. Accordingly, the Court finds that the first *DeVries* prong, whether the

---

[5] For similar reasons, Plaintiffs have not presented sufficient evidence to establish that Mr. Spurlin was exposed to a Tate product and that the exposure was a substantial factor in causing his injury for purposes of causation. This provides another ground for granting Tate's motion for summary judgment.

[6] Unless otherwise noted, the Court's reference to "Defendants" from this point forward does not include Tate.

10

product requires incorporation of a part, is satisfied with respect to Warren.

As a last point on the Court's analysis of the first *DeVries* prong as to all of the defendants, the Court finds that defense expert's statements regarding the design drawings do not undermine the aforementioned conclusions. To be sure, defense expert retired Navy Rear Admiral John B. Padgett, III, stated, as a general matter, that the design drawings' references to asbestos gaskets and packing "simply reflect the equipment manufacturer's documentation of the Navy's choice of materials." (Doc. No. 109-5 at 12.) As previously discussed, however, the Court finds that the Navy's final-say authority is not dispositive of the duty-to-warn inquiry.

Further, Captain Moore testified in his deposition that to the extent that any asbestos component was used on any equipment installed on a Navy ship, one of two things happened: (1) either the Navy's own specifications required the use of asbestos or (2) the Navy specifications allowed for the use of asbestos, and then once that decision was made by the equipment manufacturer, it was reviewed and approved by the Navy. (Doc. No. 109-6 at 11–12.) This evidence indicates that it could have been the case that Defendants chose to use asbestos parts, and their decisions were thereafter approved by the Navy for implementation. (*Id.*) As such, Admiral Padgett's statements about the drawings do not change the Court's findings.

Accordingly, for the foregoing reasons, the Court finds that the equipment supplied to the Navy by Clark-Reliance, Crane, Foster Wheeler, IMO, and Warren required incorporation of asbestos. The Court will therefore proceed to analyze whether these defendants knew or had reason to know that the integrated product is likely to be dangerous for its intended uses.

### 2. Reason to Know that the Integrated Product is Likely Dangerous

The second *DeVries* prong requires that the manufacturers knew or had reason to know that the integrated product is likely to be dangerous for its intended uses. 139 S. Ct. at 995. The latter alternative is at issue here. At the outset, the Court notes that based on its

prior analysis, Defendants knew or should have known that their equipment required periodic replacement of asbestos-containing parts when used as intended, and there is evidence that they knew that removing and replacing those asbestos parts could expose a user to asbestos dust. *See supra* § III.A.i.1.

Turning to evidence that Defendants had reason to know of the dangers of their integrated products by the time of Mr. Spurlin's service in the Navy, Plaintiffs point to their expert, Dr. Gerald Markowitz, who will opine on the knowledge generally available on the dangers of asbestos in the literature prior to 1970. (Doc. No. 111-19.) More specifically, Plaintiffs cite E.R.A. Merewether and C.W. Price's 1930 publication, "Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry." (Doc. No. 111-20.) Although this work originated in London, contemporary publications in the United States cited to Merewether et al.'s work as the leading study on the risk of asbestos. (*See, e.g.*, Doc. Nos. 111-21 at 17; 111-22 at 3).

Plaintiffs also point to Roscoe N. Gray's 1934 publication, "Attorneys' Textbook of Medicine," which contains a chapter devoted to detailing the dangers of asbestos exposure. (Doc. No 111-21 at 17.) Plaintiffs further cite publications from 1935 and 1942, informing about the risk of asbestosis and carcinoma of the lung associated with the use of asbestos in industry work. (Doc. Nos. 111-22; 111-23.) In addition, a 1934 publication by the National Safety Council, of which Crane was a member, described that asbestos "is generally recognized as a cause of severe pulmonary injury." (Doc. Nos. 111-27 at 9.) Thus, based on this evidence, the Court finds that information regarding the dangers of asbestos was available at the time Defendants sold their equipment to the Navy in the 1940s for the *McGinty* and the *Rowan*. As such, there is evidence that Defendants had reason to believe that their integrated products posed a likely danger for their intended use with the Navy.

Even assuming that Defendants were not aware of the available literature on asbestos hazards prior to selling their equipment to the Navy, later publications such as that by the American Industrial Hygiene Association in 1958 and that by the New York Academy of

Science in 1965 support imposing a post-sale duty to warn in this case. *See, e.g.*, *Jack v. DCo, LLC*, No. C17-0537JLR, 2019 WL 2288039, at *5 (W.D. Wash. May 28, 2019), aff'd, 837 F. App'x 421 (9th Cir. 2021) (considering whether manufacturers had a post-sale duty to warn in a similar asbestos case). Specifically, by 1958, the American Industrial Hygiene Association was recommending that workers take steps such as ensuring proper ventilation and wearing dust respirators to reduce dust inhalation when working with asbestos-containing products, including gaskets, valve packings, and boiler lagging. (Doc. No. 111-24 at 4.) Moreover, in the New York Academy of Science's 1965 report, one of the authors wrote that there has been an increasing amount of evidence of asbestos hazards since 1935, and that "[a]sbestosis and asbestos cancer hazards related to an inhalatory exposure to asbestos exist not only for asbestos workers properly engaged in the direct and regular production, processing, handling, and using of asbestos-containing materials, but also for the large number of individuals who may sustain such contacts on an incidental basis." (Doc. No. 111-25 at 8, 11.) Further, an internal company memorandum indicates that by May 1968, Foster Wheeler knew that there was "mounting clinical evidence" that asbestos insulation dusts "are a contributing factor to current increases in death due to: mesothelioma, lung carcinoma, pulmonary fibrosis, and calcification of the pleural plaques." (Doc. No. 111-29 at 2.)

Thus, considering the aforementioned literature and reports highlighting the dangers of asbestos, the Court finds that, at a minimum, Plaintiffs have presented triable issues of fact as to whether Defendants had reason to know that the integrated product is likely to be dangerous for its intended uses. *See DeVries,* 139 S. Ct. at 995.

### 3.  No Reason to Believe that the Product's Users will Realize the Danger

As for the third and last prong outlined in *DeVries*, the Court considers whether Defendants had "no reason to believe that the product's users will realize that danger." 139 S. Ct at 995. Here, Defendants primarily argue that Plaintiffs cannot establish this prong because they cannot prove that Defendants knew more about asbestos hazards than did the

13

Navy during the relevant period. The Court, however, finds that Plaintiffs have raised triable issues of fact as to whether Defendants had no reason to believe that their product's end user, that is Navy sailors, would realize the asbestos hazards to which they were exposed.

For example, Plaintiffs point to defense expert, Dr. Samuel Forman's reference to an article published by Navy authorities in 1946, stating that "it may be concluded that [asbestos] pipe covering is not a dangerous occupation." (Doc. No. 109-11 at 17.) There is also evidence that the Navy did not consider asbestos gaskets and packing to be hazardous during this time. (*Id.*) And although Defendants raise evidence that the Navy implemented asbestos-related safety protocols prior to Mr. Spurlin's service, there is evidence that in 1968, "the Navy came under scrutiny for its handling of asbestos-related issues." (*Id.* at 28.) Consequently, there is a genuine dispute of material fact as to whether Defendants had no reason to believe that the Navy sailors would realize the dangers of Defendants' integrated product. *See DeVries,* 139 S. Ct. at 995.

As a final note, the Court underscores the rationale in *DeVries*. Specifically, in considering the appropriate test to determine a duty to warn in the maritime context, the Supreme Court declined to adopt the "plaintiff-friendly foreseeability rule." *Id.* at 993. It reasoned that "[r]equiring a product manufacturer to imagine and warn about all of those possible uses—with massive liability looming for failure to correctly predict how its product might be used with other products or parts—would impose a difficult and costly burden on manufacturers, while simultaneously overwarning users." *Id.* The Supreme Court also declined to adopt the "defendant-friendly bare-metal defense." *Id.* This defense frees a manufacturer from liability if it "did not itself make, sell, or distribute the part or incorporate the part into the product . . . even if the product required incorporation of the part and the manufacturer knew that the integrated product was likely to be dangerous for its intended uses." *Id.* The Supreme Court rejected the bare-metal approach, finding that it "goes too far in the other direction." *Id.* at 994.

Instead, the *DeVries* court adopted an approach that falls between the two. As previously discussed, it concluded that "a manufacturer does have a duty to warn when its product requires incorporation of a part and the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses," and that under this test, "the manufacturer may be liable even when the manufacturer does not itself incorporate the required part into the product." *Id.* at 993–94. Guided in part by "[m]aritime law's longstanding solicitude for sailors," the Supreme Court found that requiring a warning under these circumstances is most appropriate. *Id.* at 995.

Against this backdrop, the Court finds that imposing a duty on the manufacturers in this case is consistent with the aforementioned principles and rationale in *DeVries*. Here, the manufacturers need not imagine all the possible ways that their products might be used with other parts—the Navy told them. Indeed, Defendants concede that the Navy's specifications required the use of asbestos, and thus, they were aware that their products would be used with asbestos parts. Because of this, the manufacturers in this case knew "the nature of the ultimate integrated product" and given the available literature on the dangers of asbestos, was likely "aware of the risks associated that integrated product." *Id.* at 994. As such, there is evidence that Defendants owed Mr. Spurlin a duty to warn, even if they themselves did not incorporate the asbestos into their products. Accordingly, for the foregoing reasons, the Court **DENIES** Defendants' motions for summary judgment on this basis.

### ii.   Causation

Next, Defendants argue that Plaintiffs' evidence cannot establish causation. The parties do not dispute that Plaintiffs must prove that (1) "he was actually exposed to [Defendants'] asbestos-containing materials" and (2) "such exposure was a substantial contributing factor in causing his injuries." *McIndoe*, 817 F.3d at 1174 (citing *Lindstrom v. A–C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir.2005)[7]).

---

[7] This case was abrogated on other grounds by *DeVries*.

1.  **Actual Exposure to Defendants' Products**

As to whether Mr. Spurlin was actually exposed to Defendants' asbestos-containing products, Plaintiffs contend that they have presented eyewitness and expert evidence of actual exposure sufficient to defeat Defendants' motion for summary judgment on this basis. The Court agrees.

Mr. Spurlin's deposition testimony and Captain Moore's report details that Mr. Spurlin worked in the fire rooms on the *McGinty* and the *Rowan*, that Defendants' boilers, pumps, valves, and replacement parts were present in those rooms, and that Mr. Spurlin's task of ongoing maintenance of those products, such as replacing gaskets on the equipment and sweeping the area, resulted in asbestos dust in the air that he breathed. (Doc. Nos. 109-21; 111-2.) There is also evidence that replacement kits that Mr. Spurlin used to replace gaskets were unique and specific to the parts being replaced, indicating that the manufacturers themselves supplied the replacement parts.

Moreover, Mr. Spurlin's shipmates, Johnny Eisenman and Joseph Barrell provided further evidence of his exposure. (Doc. Nos. 111-4; 111-5.) Mr. Eisenman confirmed that he and Mr. Spurlin repaired and maintained equipment such as valves and pumps in the fire room, that they worked with gaskets and packing daily, that gasket removal created dust, and that they always worked in dusty conditions. Mr. Barrell similarly testified, reiterating that removing gaskets, included use of scrapers and wire brushes, creating dust that everyone in the fire rooms breathed. Moreover, Mr. Spurlin testified that in the two years he served on the *Rowan*, every piece of equipment in the boiler room was worked on, and that whether it was him or a shipmate replacing the gaskets, everyone was exposed to the dust due to limited ventilation.

Thus, based on the foregoing and construing the evidence in the light most favorable to Plaintiffs, the Court finds that there is sufficient evidence for a reasonable jury to find that Mr. Spurlin was exposed to Defendants' products. *See, e.g.*, *McIndoe*, 817 F.3d at 1176 (observing that the evidence of exposure was "not especially strong" but concluding that

3:19-cv-02049-AJB-AHG

"a jury *could* determine that McIndoe was exposed to originally installed asbestos, even if it seems unlikely that a jury *would* do so.") (emphasis in original).

### 2. Substantial Factor in Causing the Injury

Having found there to be sufficient evidence of actual exposure, the Court turns to whether any such exposure was a substantial contributing factor to Mr. Spurlin's injuries. *Id.* Plaintiffs may satisfy the substantial-factor test by demonstrating that Mr. Spurlin "had substantial exposure to the relevant asbestos for a substantial period of time." *Id.* "Evidence of only minimal exposure to asbestos is insufficient." *Id.* Rather, "there must be a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id.* (internal quotation marks and citation omitted).

In *McIndoe*, the Ninth Circuit affirmed the district court's finding that the plaintiffs did not provide sufficient evidence to show exposure to asbestos for a substantial period of time because, at most, they showed only that "McIndoe was 'frequently' present during the removal of insulation" and "present 20–30 times during such removal." *Id.* Moreover, because the plaintiffs failed to present evidence of the amount and duration of asbestos exposure, the *McIndoe* court found that they could not satisfy the substantial-factor test. *Id.* Mr. Spurlin's case is distinguishable.

Here, Plaintiffs have marshalled more evidence than the plaintiffs in *McIndoe*. In particular, there is evidence that for the approximately two years that Mr. Spurlin worked as a boiler tender, he was exposed to asbestos dust daily as a result of his work repairing and maintaining all of the equipment in the fire rooms, as well as cleaning and sweeping up the fire room. Unlike Mr. McIndoe, Mr. Spurlin was not present only 20 to 30 times in an area where asbestos dust floated—he worked there (the fire room) every day for two years. As such, this is not a case where Plaintiffs have presented only "a mere showing that defendant's product was present somewhere at plaintiff's place of work." *Lindstrom*, 424 F.3d at 492 (cited with approval by *McIndoe*, 817 F.3d at 1176).

More specifically, Mr. Eisenman's deposition testimony indicates that he and Mr. Spurlin worked daily to maintain the pumps and hundreds of valves in the fire room, and

that they spent approximately 12 to 16 hours in the fire room each day. (Doc. No. 111-4 at 20–21.) Mr. Eisenmann also testified that because of their work with insulation, gaskets, and packing, they worked in dusty conditions "all the time." (*Id.* at 36.) Thus, applying basic math, a juror could infer that over the course of his two-year service in the fire room, Mr. Spurlin was exposed to asbestos dust for thousands of hours.

As for the amount of exposure, Plaintiffs provided expert testimony indicating that work with asbestos gaskets and packing causes between 0.1 to 10 fibers/cc, with higher levels associated with dustier practices such as air blowout of packing and post-work cleanup. (Doc. Nos. 109-40 at 5; 111-16 at 11–12.) Plaintiffs also presented evidence that removal of a gasket using a wire brush or scraping and sweeping after removal results in exposure to the worker of 1,700,000 to 11,000,000 asbestos fibers 5 microns in length or over, with the possibility of exposure to billions or even trillions of shorter fibers, and that exposure to these fibers can contribute to the development of mesothelioma. (Doc. No. 111-17 at 14.)

Moreover, Plaintiffs' causation expert, Dr. Barry Horn, opined that, based on his review of Mr. Spurlin's medical records, deposition testimony, and Captain Moore's report, "the work that [Mr. Spurlin] did with gaskets and packing and the work done by other military personnel with gaskets and packing contributed to his risk for the development of mesothelioma." (Doc. No. 109-22 at 47.) Dr. Horn further opined that Mr. Spurlin "was exposed to asbestos because of work done on equipment manufactured by Crane, Foster Wheeler, DeLaval, Jerguson, and Warren Pumps. These exposures contributed to his risk for the development of mesothelioma." (*Id.* at 41.) As such, based on the foregoing evidence, Plaintiffs have shown "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *McIndoe*, 817 F.3d at 1176.

Lastly, with respect to product-specific exposure, the Court notes that Mr. Spurlin testified that all of the equipment in the fire room—which as previously discussed contained Defendants' products—was worked on during his time on the *Rowan*, and that

whether it was him or a shipmate working on the equipment, the limited ventilation made it such that they all breathed the dust in the air. Moreover, in his deposition, Mr. Spurlin recalled working on Foster Wheeler boilers and associated the name DeLaval with pumps. And although direct evidence is not necessary to defeat summary judgment, Clark-Reliance, Crane, and Warren all point to Mr. Spurlin's inability to identify their company's name with the specific product (i.e., gauge glass assembly, valve, or pump) with which he worked. However, because there is evidence that Clark-Reliance's, Crane's, and Warren's products were present in the fire rooms in which Mr. Spurlin served, and that all of the equipment in the fire rooms were worked on during the two years that Mr. Spurlin served, the Court does not find Mr. Spurlin's inability to match a company's name with its product to be consequential here. *See, e.g.*, *Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1038 (D. Haw. 2013)[8] ("[T]he court rejects Defendants' arguments that Plaintiffs must present direct evidence that Cabasug recalled working on a particular product by the Defendant and recalled the particular vessel upon which it was installed.").

Instead, the Court finds that the expert and deposition evidence that Plaintiffs presented—i.e., that Defendants' products were in the specific area in which Mr. Spurlin worked for two years, that Mr. Spurlin's and his shipmates' daily routine consisted of repairing, maintaining, and cleaning up various equipment in the fire room in dusty conditions, and that such labor exposes a worker to an amount of asbestos fibers that can contribute to the development of mesothelioma—altogether provide a basis upon which "a jury *could* determine" that the asbestos from Defendants' products was a substantial contributing factor to his injuries, "even if it seems unlikely that a jury *would* do so." *McIndoe*, 817 F.3d at 1176 (emphasis in original).

Thus, for the reasons stated, the Court finds that Plaintiffs have marshalled sufficient evidence to create a triable issue of fact as to whether exposure to Defendants' products was a substantial factor in causing his injuries. *See McIndoe*, 817 F.3d at 1174; *see*

---

[8] This case was abrogated on other grounds by *DeVries*.

*generally Hammell v. Air & Liquid Sys. Corp.*, No. CV1400013MASTJB, 2020 WL 5107478, at *7 (D.N.J. Aug. 31, 2020) ("[T]he question of substantiality is one of degree normally best left to the factfinder.") (internal quotation marks and citation omitted). Accordingly, the Court **DENIES** Defendants' motions for summary judgment on this basis.

### iii. Government Contractor Defense

Turning to Defendants' motion for summary judgment based on the government contractor defense, Defendants have the burden of showing the absence of a genuine dispute as to any material fact regarding whether they are entitled to the defense. To prevail on a government contractor defense, Defendants must show that "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

At a minimum, Plaintiffs have presented a triable issue on whether "the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* There is no evidence that Defendants warned the United States about asbestos hazards in the use of their equipment. And as previously discussed, there are triable issues as to whether Defendants knew more about the dangers of their equipment than did the United States. *See supra* § III.A.i.2, 3. *See also Willis v. BW IP Int'l Inc.*, 811 F. Supp. 2d 1146, 1157 (E.D. Pa. 2011) (finding the same in an asbestos multidistrict litigation).

To be sure, Defendants presented evidence that the Navy has known that asbestos could lead to pulmonary disease since the 1920s and prescribed guidance for the prevention of asbestos exposure in the 1940s. However, the evidence also shows that the Navy relied on the erroneous Fleischer–Drinker Report, which indicated that working with asbestos insulation aboard naval vessels "is not a dangerous occupation," and that the Navy did not consider asbestos gaskets and packing to be hazardous during this time. (Doc. No. 109-11

20

at 17.) Moreover, contrary to Defendants' argument that the Navy was the premier authority on asbestos hazards, there is evidence that the National Safety Council was informing its members, which included Crane, that asbestos "is generally recognized as a cause of severe pulmonary injury" (Doc. No. 111-27 at 9), and that "[i]f you can see the dust, you know it to be a terrific hazard." (Doc. Nos. 111-28 at 5.) Additionally, there is evidence that by May 1968 there was "mounting clinical evidence" that asbestos was a contributing factor to rising deaths due to diseases like mesothelioma, (Doc. No. 111-29 at 2), and that in the same year, "the Navy came under scrutiny for its handling of asbestos-related issues." (Doc. No. 109-11 at 28.)

As such, the evidence gives rise to a reasonable inference that Defendants knew more about the dangers of their products than did the United States. *See Boyle*, 487 U.S. at 512. Consequently, there being a genuine dispute of material fact with respect to at least one of the elements under *Boyle*, the Court finds that Defendants are not entitled to summary judgment based on a government contractor defense.[9] Accordingly, the Court **DENIES** Defendants' motion for summary judgment on this basis.

### iv.   Loss of Consortium and Punitive Damages

Lastly, Defendants argue that pursuant to *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), Plaintiffs' claims for loss of consortium and punitive damages are non-pecuniary losses that are not available under maritime law. Plaintiffs assert that *Miles* should not be interpreted so broadly, and that they are not precluded from seeking non-pecuniary losses. The Court agrees with Defendants.

In *Miles*, a mother of a seaman, who died from injuries aboard the defendants' vessel, pursued a claim for loss of society under general maritime law. In deciding whether she could recover damages for loss of society under general maritime law, the Supreme Court

---

[9] Because the Court finds a genuine dispute of material fact as to the third prong of the *Boyle* test, the Court need not consider the first and second prongs to conclude that Defendants are not entitled to summary judgment. The Court, however, will later consider the first and two prongs as it relates to Plaintiffs' cross-motion for summary judgment on this defense.

considered the damages available under wrongful death actions pursuant to the Jones Act and the Death on the High Seas Act (DOHSA). Observing that Congress chose to limit recovery under those statutes to pecuniary loss, and recognizing the "value of uniformity," the Supreme Court held that there is "no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman." *Id.* at 33. The *Miles* court further noted that it was "restoring[ing] a uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.*

Then, in *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404 (2009), the Supreme Court held that an injured seaman is not precluded from recovering punitive damages for his employer's willful failure to pay maintenance and cure. 557 U.S. at 407. In so holding, the Supreme Court reasoned that "[h]istorically, punitive damages have been available and awarded in general maritime actions, including some in maintenance and cure" and found "that nothing in *Miles* or the Jones Act eliminates that availability." *Id.*

After *Townsend*, the Supreme Court considered whether punitive damages are available in unseaworthiness actions in *The Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019). Synthesizing the principles from its prior rulings in *Miles* and *Townsend*, the *Batterton* court reasoned: "because there is no historical basis for allowing punitive damages in unseaworthiness actions, and in order to promote uniformity with the way courts have applied parallel statutory causes of action, we hold that punitive damages remain unavailable in unseaworthiness actions." *Batterton*, 139 S. Ct. at 2278. The Supreme Court noted that despite punitive damages being a well-established part of the common law, the plaintiff presented "no decisions from the formative years of the personal injury unseaworthiness claim in which exemplary damages were awarded." *Id.* at 2284. The *Batterton* court therefore found that "unlike maintenance and cure, unseaworthiness did not traditionally allow recovery of punitive damages." *Id.*

Applying the rationale in the aforementioned cases, the relevant question before the Court is whether Plaintiffs have presented historical evidence that non-pecuniary losses such as punitive damages and loss of consortium have been traditionally recoverable under

3:19-cv-02049-AJB-AHG

a general maritime law negligence action, and would not offend *Miles*'s command that federal courts should "promote 'a uniform rule applicable to all actions' for the same injury, whether under the Jones Act or the general maritime law." *Batterton*, 139 S. Ct. at 2285 (quoting *Miles*, 498 U.S. at 33). Plaintiffs have presented no such evidence.

Instead, they generally assert that the common-law tradition of punitive damages extends to maritime claims and therefore "are manifestly recoverable in this case." (Doc. No. 111 at 37.) As such, much like the plaintiff in *Batterton*, Plaintiffs have not pointed to any decision in the formative years of maritime negligence claims in which punitive damages were awarded. *Batterton*, 139 S. Ct. at 2284. Therefore, just as the Supreme Court found "the absence of historical evidence to support punitive damages" for unseaworthiness claims to be consequential to its holding in *Batterton*, the Court finds the absence of the same evidence with respect to negligence claims similarly consequential here. *Id.* at 2285.

Moreover, the Court finds that *Miles*' command to promote "a uniform rule applicable to all actions for the same injury, whether under the Jones Act or the general maritime law" further supports not expanding the recoverable damages to non-pecuniary losses. *Id.* (quoting *Miles*, 498 U.S. at 33). Although Plaintiffs do not bring a case under the Jones Act, it is a statutory cause of "action for compensatory damages, on the ground of negligence." *Id.* As such, the Jones Act is a parallel statutory scheme that provides an appropriate benchmark in considering whether non-pecuniary losses are allowable here. *See id.* at 2278. Notably, the Supreme Court has "observed that the Jones Act limits recovery to pecuniary loss," and that "Federal Courts of Appeals have uniformly held that punitive damages are not available under the Jones Act." *Id.* at 2285 (internal quotation marks and citations omitted). Thus, the Court finds that adopting the rule urged by Plaintiffs would be contrary to the command for uniformity between rules governing the same injury, whether under the Jones Act or under the general maritime law. *See id.*

There being no evidence that punitive damages were traditionally awarded in maritime negligence cases, coupled with the observation that a parallel statutory scheme

23

does not allow for recovery of non-pecuniary losses, the Court finds that Plaintiffs' claims for punitive damages and loss of consortium are unavailable. *See Batterton*, 139 S. Ct. at 2283 n.6 ("Absent a clear historical pattern, *Miles* commands us to seek conformity with the policy preferences the political branches have expressed in legislation.") (full internal citation omitted); *see also Smith v. Trinidad Corp.*, 992 F.2d 996, 996 (9th Cir. 1993) (holding that loss of consortium is not available under the Jones Act or general admiralty law). Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on this basis.

### B.   Plaintiffs' Cross-Motion for Summary Judgment

Having considered Defendants' omnibus motion for summary judgment, the Court turns to Plaintiffs' cross-motion for summary judgment on Defendants' government contractor defense, sophisticated user defense, and superseding cause defense. (Doc. No. 111). The Court discusses each in turn.

### i.   Government Contractor Defense

As to Plaintiffs' cross-motion for summary judgment on Defendants' government contractor defense, the Court finds that Defendants have presented sufficient evidence to create a genuine issue of fact as to each element of the defense. The Court reiterates that with respect to the third prong of the *Boyle* test, Defendants presented evidence that the Navy was aware of asbestos dangers since the 1920s and had, over time, implemented protocols to prevent asbestos exposure. *See supra* § III.A.iii. With respect to the first and second prongs under *Boyle*, Defendants also provided expert reports to support their contention that the Navy reviewed and approved Defendants' equipment manuals. Consequently, the Court finds that Defendants have presented evidence from which a jury could reasonably infer that they have established a government contractor defense. *See Boyle*, 487 U.S. at 512. Accordingly, the Court **DENIES** Plaintiffs' cross-motion for summary judgment on this affirmative defense.

### ii.   Sophisticated User Defense

Next, Plaintiffs request that the Court grant them summary judgment on Defendants'

"sophisticated user" defense. The parties' briefings, however, appear to raise issues concerning the sophisticated purchaser defense. As a district court has noted, "[t]hese defenses have been recognized under a variety of circumstances, and courts have at times referred to these terms interchangeably and/or inconsistently." *Cabasug v. Crane Co. II*, 988 F. Supp. 2d 1216, 1219 (D. Haw. 2013) (citation omitted). Taking the parties' lead, the Court considers whether the sophisticated purchaser defense applies in this case.[10]

Under the sophisticated purchaser defense, manufacturers or suppliers of a product are absolved for liability caused to an ultimate end-user (here, Mr. Spurlin) "if they establish that they: (1) knew that an intermediary (i.e., the Navy) was aware of the dangers of asbestos, and (2) reasonably concluded that the intermediary would provide warnings to its employees." *Id.* In support of their motion, Plaintiffs cite the asbestos MDL court's decision in *Mack v. Gen. Elec. Co.*, 896 F. Supp. 2d 333, 339–43 (E.D. Pa. 2012). There, the court thoughtfully examined existing jurisprudence and maritime policy considerations and held that "the 'sophisticated purchaser' defense is not available under maritime law in cases involving asbestos." *Id.* at 343. The Court sees no reason why this conclusion should not apply in this case, and Defendants offer none.

Moreover, in *Cabasug II*, a district court granted the plaintiffs' motion for summary judgment on the defendants' sophisticated purchaser defense, noting that "although Defendants have presented reams of evidence regarding the Navy's knowledge of the dangers of asbestos, they have presented no evidence that Defendants (1) provided any warnings to the Navy regarding asbestos; (2) determined the Navy's knowledge of the dangers of asbestos; or (3) determined or otherwise reasonably concluded that the Navy would provide warnings to its employees regarding the dangers of asbestos." 988 F. Supp.

---

[10] In any event, the Court notes that under the sophisticated user defense, manufacturers or suppliers of a product bear the burden of showing that the ultimate end-user of the product (here, Mr. Spurlin) was a "sophisticated" user of the product. *Cabasug II*, 988 F. Supp. 2d at 1219. To the extent that the parties dispute whether this defense applies in this case, the Court finds that Defendants have not presented evidence that Mr. Spurlin, who was a teenager at the time of his service and testified that he was never given asbestos warning by the Navy, would be considered a "sophisticated user."

2d at 1228. The same is true in this case.

Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment on Defendants' sophisticated purchaser defense.

### iii.   Superseding Cause Defense

Finally, Plaintiffs request the Court to grant them summary judgment on Defendants' superseding cause defense. "The doctrine of superseding cause is applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996) (alterations omitted) (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994)).

Defendants assert that "the continuous and intervening breaches of the duties by the U.S. Navy severed the causal chain between any alleged negligence of Defendants and Plaintiff's exposure" and that "[t]he evidence will show that the absence of product warnings had no effect on Plaintiff's exposure." (Doc. No. 112 at 37.) Plaintiffs argue that Defendants have not presented evidence that the Navy's failure to warn was foreseeable. The Court, however, is not convinced by Plaintiffs' assertion that there is a lack of evidence regarding the Navy's activities relevant to a superseding cause theory. The Court also notes that the record contains evidence, including Mr. Spurlin's history of smoking and post-Navy employment, which may also give rise to a superseding cause defense. (Doc. No. 109-22 at 21–23.) Accordingly, the Court finds that there is a triable issue on this defense and therefore **DENIES** Plaintiffs' motion on this basis.

//
//
//
//
//
//

3:19-cv-02049-AJB-AHG

**IV.   CONCLUSION**

In sum, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' omnibus motion for summary judgment. (Doc. No. 105.) Specifically, the Court **GRANTS** Tate's motion for summary judgment, and **GRANTS** Defendants' motion for summary judgment on Plaintiffs' loss of consortium and punitive damages claims. Because there are genuine disputes of material fact as to a duty to warn and causation with respect to Clark-Reliance, Crane, Foster Wheeler, IMO, and Warren, the Court **DENIES** these defendants' motion for summary judgment on these issues. The Court also **DENIES** their motion for summary judgment on the government contractor defense.

Furthermore, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' cross-motion for summary judgment. (Doc. No. 111.) In particular, the Court **GRANTS** Plaintiffs' motion for summary judgment on the sophisticated purchaser defense, and **DENIES** it with respect to the government contractor and superseding cause defenses.

**IT IS SO ORDERED**.

Dated:  May 7, 2021

Hon. Anthony J. Battaglia
United States District Judge

27

3:19-cv-02049-AJB-AHG